# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 9, 2015 Session

## STATE OF TENNESSEE v. JONATHAN CHRISTOPHER CAREY

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-142     Amanda McClendon, Judge**

———————————————————

**No. M2014-02373-CCA-R3-CD – Filed December 10, 2015**

———————————————————

A Davidson County jury convicted the Defendant, Jonathan Christopher Carey, of driving while intoxicated ("DUI"), and the trial court found him guilty of violating the implied consent law. The trial court sentenced the Defendant to eleven months and twenty nine days for the DUI conviction and ordered that he lose his driving privileges for one year for violating the implied consent law. On appeal, the Defendant contends that: (1) his constitutional right pursuant to the Confrontation Clause was violated; (2) the trial court erred when it declined to instruct the jury about a missing witness; (3) the trial court erred when it admitted the video recording of his traffic stop into evidence; (4) the evidence is insufficient to sustain his convictions; and (5) the trial court erred when it enhanced the Defendant's sentence based upon a reckless driving charge. After a thorough review of the record and applicable law, we conclude that the Defendant's right to confront a witness against him was violated when the trial court allowed the admission of the videotape of him performing field sobriety tasks and the officer conducting those tasks was not present at trial. Accordingly, we reverse the trial court's judgments, vacate the Defendant's convictions, and remand the case for further proceedings consistent with this opinion.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Rob McKinney and Brittney S. Hollis, Nashville, Tennessee, for the appellant, Jonathan Christopher Carey.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Kyle Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from a traffic stop of the Defendant's vehicle in the early morning hours of November 2, 2011. Based upon this stop, and the evidence gathered therein, the Davidson County grand jury indicted the Defendant for DUI and violation of the implied consent law. On the day of trial, the State informed the trial court that there were two officers involved in this stop: Officer Jeffery Cason and Officer Wallace Taylor. Officer Cason was present at trial and planned to testify but Officer Taylor had since retired and would not be available to testify. The State asked to have Officer Cason authenticate the video of the stop, as he was present, and the Defendant objected citing *Crawford v. Washington* and the confrontation clause of the U.S. and Tennessee Constitutions, hearsay, and Tennessee Rules of Evidence 401 and 403. The State argued that the video was not hearsay so *Crawford* did not apply. It further offered that the witness, Officer Taylor, was unavailable, as contemplated by the hearsay rule, and that the State was not offering the video to prove the truth of the matter asserted. The trial court ruled that the videotape was admissible. The parties then discussed the issue of the subpoena of Officer Taylor, and the State explained that it had not served Officer Taylor with a subpoena based upon a ruling of another judge in another case. The State asked for a continuance to serve a subpoena on Officer Taylor. The Defendant objected to the continuance, and the trial court sustained the Defendant's objection, ordering that the case proceed to trial that day.

The parties then presented the following evidence: Officer Cason, with the Metropolitan Nashville Police Department, testified that he was a patrol officer on November 2, 2011, the date of the Defendant's arrest. He recalled that, around 2:00 a.m., he observed the Defendant driving without his headlights illuminated. He noted that it was dark and headlights were necessary. Officer Cason, who was in a marked police cruiser, turned his vehicle behind the Defendant and activated his emergency lights. Officer Cason testified that the Defendant initiated his right turn signal but then traveled to the left into a turning lane. The Defendant stopped in the turn lane for brief period while a car passed and then continued driving, veering back into his own lane. The Defendant turned onto another road and, when he did so, over half of his vehicle crossed the double yellow lines into the oncoming traffic lane. The Defendant was "very slow to correct" and traveled half a block before he pulled his car over to the side of the road and came to a stop.

Officer Cason said that he approached the Defendant's vehicle, a 2011 Kia Optima, to speak with him. The Defendant attempted to roll down his window but kept locking and unlocking the door instead. Officer Cason estimated that this occurred for 45

2

seconds until the Defendant "gave up" and opened his door instead to speak with the officer. Officer Cason testified that, when the door was opened, there was an "immediate obvious heavy odor of alcohol," emanating from the vehicle. He noted that the Defendant's eyes appeared bloodshot and watery and that he slurred his speech.

Officer Cason said that the Defendant provided his driver's license upon request. The Defendant, who had a passenger with him, said that he was coming from Franklin, Tennessee, and, after a night in Nashville, was headed back to Franklin and that he was a designated driver that evening. Officer Cason returned to his vehicle and determined that the Defendant had a valid driver's license.

Officer Cason said that he returned to the Defendant's vehicle and asked the Defendant to step out. As the Defendant exited his vehicle, he dropped his keys on the ground and nearly fell over attempting to retrieve the keys. The Defendant was "unsteady" on his feet, and there was a "very obvious heavy odor" of alcohol expelling from his breath. Officer Cason told the Defendant that the officer believed the Defendant had been drinking alcohol, and the Defendant replied "that's because I'm the designated drinker." Officer Cason asked him to repeat himself, and the Defendant again said he was the "designated drinker" because "that guy in [his] car [wa]s trashed." Officer Cason informed the Defendant that he thought the Defendant meant to say "designated driver."

Officer Cason testified that he called for an officer who specialized in conducting field sobriety tasks. Officer Cason explained that field sobriety tasks are performed by a "DUI officer." A DUI officer was an officer who was trained to assist during DUI stops and were "incredibly proficient" at intoxication assessment. Officer Cason said that he had been trained in DUI investigation and that he could make DUI arrests alone. He further stated that he had done so on multiple occasions, but the protocol for the police department required a DUI officer to report to all DUI stops, if available, in order to allow patrol officers to continue patrolling their assigned zone. Officer Cason explained that a DUI arrest could take between two and three hours, during which time another officer would have to patrol the zone that Officer Cason patrolled. If a DUI officer was unavailable, however, a patrol officer would conduct the field sobriety tasks, which was a common occurrence. Officer Wallace Taylor was the DUI officer who responded in this case.

Officer Cason testified that they had to wait approximately ten minutes for Officer Taylor to arrive. During that time, the Defendant informed him that he was a backup dancer for a well-known music artist. Officer Carson testified that he thought that a dancer of this caliber would have better than average balance, which the Defendant was not demonstrating. Officer Cason opined that the Defendant was impaired at the time of the traffic stop and should not have been driving.

3

Officer Cason testified that Officer Taylor had retired since this incident and was no longer testifying at court appearances. He said that Officer Taylor had video recording equipment, complete with audio recording capabilities, with him the evening of the Defendant's stop. When Officer Taylor arrived, Officer Cason informed him of the events that had occurred, his observations, and the details of the stop. Officer Cason then turned his attention toward the Defendant's passenger while Officer Taylor administered the field sobriety tasks. Officer Cason said that Officer Taylor recorded the Defendant during the field sobriety tasks. Officer Cason identified the video taken by Officer Taylor, noting that Officer Cason appeared intermittently in the video attending to different duties during the field sobriety tasks.

During cross-examination, Officer Cason agreed that, after Officer Taylor began the field sobriety tasks, Officer Cason paid less attention to the Defendant, turning his focus elsewhere. Officer Cason agreed that, before he activated his emergency lights, he did not see the Defendant driving poorly, other than failing to illuminate his headlights. Officer Cason said that he was not familiar with the Defendant's breath test or about whether he was given the implied consent warnings. Officer Cason said that, while he glanced at the Defendant during the administration of the field sobriety tasks, he did not observe him closely enough to determine how he performed on those tasks.

The State sought to introduce the video recording of the Defendant performing the field sobriety tasks, and the Defendant objected. During a jury-out hearing, the Defendant argued that the State had waived introducing the video because it had not played it during Officer Cason's testimony. The Defendant also renewed his objection based upon the Confrontation Clause. He said the video was misleading and confusing to the jury because there was no witness to explain what was happening during the video recording. He further posited that he was precluded from asking questions about the internal workings of the breath test machine.

The trial court found:

> I think [the jury] can observe the video. First of all, it's already introduced as an exhibit. This objection should have been raised prior to it being introduced and marked as Exhibit 2, but I agree with you in that, I mean, no one can do a running commentary I think to say that's this test or that test, or he is failing here. I think the jury can look at the tape and form their own opinion just as much as I see someone . . . . .

The parties then discussed the audio portion of the video recording, and the Defendant contending that the audio portion of the recording also violated his right to confront

4

Officer Taylor as a witness. The State contended that Officer Taylor's statements on the video did not comment on the Defendant's performance on the field sobriety tasks but that they put into context the Defendant's admissions during the tasks, which indicated impairment. The trial court ruled that the State could introduce the audio and video recordings but asked the parties to offer him a curative instruction to give to the jury about Officer Taylor's statements. The parties discussed and agreed to a curative instruction.

The trial court then instructed the jury when they returned to open court:

We're getting ready to watch the video that was recorded the night of the incident or reported incident. In that video there will be Officer Wallace Taylor who is not present. Any statements made by Officer Taylor on this video are not evidence. Disregard them. Thank you.

The video recording shows Officer Cason approaching Officer Taylor and informing him of the circumstances. Officer Taylor then approached the Defendant and asked how much he had had to drink. The answer is unclear. The officer asked the Defendant his age, and he said 29. The officer again asked the Defendant his age, and he said he was 32. Officer Cason asked the Defendant to come to the area near his police cruiser so that he could perform some field sobriety tasks. Officer Taylor asked the Defendant if he had any problems with his feet, legs or back and the Defendant indicated negatively. Officer Taylor then had the Defendant follow a pen with his eyes, and instructed the Defendant not to move his head.

The video then showed Officer Taylor giving the Defendant a heel to toe walking test. When the Defendant stood with one foot directly behind the other foot he swayed and stumbled. The Defendant repeatedly said that he was "dyslexic." The Defendant then began walking heel to toe, and he paused at one point before he turned around in accordance with the officer's instructions. The Defendant then attempted to keep one of his feet elevated six inches off of the ground while counting. He repeatedly swayed, putting his foot back down, and appeared to have difficulty re-elevating his foot. Following the field sobriety tasks, Officer Taylor placed the Defendant under arrest.

The video showed that, after Officer Taylor placed the Defendant under arrest, Officer Cason approached. Officer Cason stated that he "laughed" at the Defendant's performance during the one-legged stand test, and then Officer Taylor stated that the Defendant kept "walking and walking" during the other field sobriety test. Officer Taylor asked Officer Cason to call the Defendant's passenger a cab because the Defendant was "ripped, ripped, ripped, ripped." Officer Cason then asked if the Defendant was taking five second intervals during one of the tests, and Officer Taylor

5

responded that the Defendant "couldn't hold his foot up he [was] just too intoxicated." When discussing what to do with the Defendant's car, Officer Taylor told Officer Cason that the Defendant "is not in any condition to be making decisions." Officer Taylor then told Officer Cason to tow the Defendant's car because "he's too impaired."

As the video continued, while in the car with Officer Taylor, the Defendant responded to the officer's questions. He stated that he was from Franklin, Tennessee, and that he was a professional dancer, dancing as a backup dancer for a music artist. The Defendant said he had not eaten in a week, explaining that he had a painful condition that involved inflammation of the lungs. He said that he had slept for six hours the night before. The Defendant admitted that he had consumed three bottles of vodka that evening. When asked what size bottles of vodka he said "beer." The Defendant then said that he had consumed three beers that evening.

The Defendant discussed with the officer his high school career and his dancing career. He said that he graduated from high school in 1979, and he then corrected himself and said he was born in 1979. The Defendant said that he studied the creative arts while in school and that he had a "great" family. His parents, however, recently got divorced and his mother had moved to Florida. The Defendant recalled that on the evening of his arrest, a "really good" friend was visiting him from Atlanta, Georgia. He wanted to show him what Nashville "was all about, show him Broadway, do the tourist thing driving around different places . . . ." The Defendant said that he took his friend to multiple places that evening.

Officer Taylor was then heard reading the Defendant the implied consent law. Officer Taylor said that the Defendant was under arrest for DUI and that there were reasonable grounds to believe that he was under the influence of an intoxicant while driving. Officer Taylor asked the Defendant to submit to a test to determine the amount of intoxicants in his blood. The officer said that if the Defendant refused to submit that the trial court could revoke his license for one year. The Defendant agreed to take the breathalyzer test, and the officer gave the Defendant his Miranda warnings. The Defendant informed the officer that he had pleurisy, which was an inflammation of the lungs. The Defendant told the officer that it hurt any time he took a breath.

Officer Taylor said he was going to give the Defendant a tube and that he wanted him to breathe into the tube long and hard. Officer Taylor then raised his voice and said "blow, blow, blow." He told the Defendant that he had to blow hard. The officer said that the machine indicated whether or not the Defendant was blowing and that it indicated that he was not. The Defendant attempted to blow again, and the officer expressed frustration. The Defendant told the officer that he was trying to blow, and Officer Taylor yelled, "No, you're not!" The officer informed the Defendant that he was going to jail if

he did not blow harder, and the Defendant again said that he was trying. The officer again said angrily that the Defendant was not trying to blow into the breathalyzer. The Defendant attempted a last time to blow, after which Officer Taylor said, "Okay, off to jail."

The Defendant testified that he had been a dancer on tour with a well known artist and that, toward the end of the tour, he experienced health issues, believing he was having a seizure or a brain aneurysm. Before the end of the tour, he was diagnosed with positional vertigo. He explained that "any kind of trigger" could bring on an attack of vertigo. The Defendant said that he experienced an episode of vertigo the evening of his arrest. He stated that he knew that "something wasn't right" while they were at the last establishment and that he wanted to leave. The Defendant said he spoke with his doctor, who told him to sit down if he was standing, so his symptoms would subside. He said that his symptoms did subside but returned when the officer asked him to stand. The Defendant said that he did not tell the officer that he had vertigo because, during an episode, he experienced a "decrease of consciousness" that made him unable to think "correctly" or to form words. The Defendant testified that he had consumed three beers over a four hour period and that the last beer he had consumed before driving was more than an hour before he drove.

The Defendant said that he attempted to blow as hard as he could during the breathalyzer test. He stated that he had informed the officer that he had pleurisy, which is an infection of the lungs. The Defendant explained that he had suffered from this infection of his lungs for seven or eight years and that breathing sometimes felt like being stabbed with a knife. The Defendant said that he would have gladly submitted to a blood test because it would have proven his innocence.

During cross-examination, the Defendant said that he had taken dance classes for years, including while in college, and that he taught dance. At the time of his arrest, he worked as a back-up dancer for a well-known music artist. He said that he performed four songs on stage with her. He testified that two of the songs were up tempo songs, and that there were lights "going on and off" and smoke emitted during the performances.

The Defendant testified that he and his friend went to four or five different establishments the evening before his arrest. He said that they went to the Red Door, where he had a beer. They then went to Rebar, where his friend consumed a "Bushwacker," which was a milkshake containing alcohol. The Defendant said that this was a very strong drink, so he did not have one because he was driving. The Defendant testified that, instead, he drank one beer while at Rebar. From Rebar, the two men went to Whiskey Kitchen, where the Defendant had another beer. From Whiskey Kitchen, the two went to Mai, a dance club where the Defendant said that he did not drink alcohol.

7

The Defendant said that he began feeling the vertigo attack coming on, so he told his friend they needed to leave. They decided to eat at Paradise Park. The Defendant said that he had previously been on medication for vertigo but that he had discontinued his medication shortly before his arrest so that he could participate in a sleep study designed to diagnose narcolepsy and sleep apnea.

The Defendant said that, when the officer asked him to exit his vehicle, he felt the onset of his vertigo triggered. The Defendant said he was unsure if he spoke with his doctor that evening. The Defendant said that during the duration of his conversation with Officer Taylor he was experiencing a vertigo attack and having trouble articulating his words.

The Defendant agreed that he told Officer Taylor that he had consumed three bottles of vodka, which was not accurate, and that he also said that he was the designated drinker. He explained that he "messed up [his] words" because of his ADD and the symptoms of vertigo. The Defendant said that he correctly told Officer Taylor that he had not eaten for a week. He said that he had been diagnosed with severe clinical depression and that he was in a depressive episode at the time of his arrest.

Based upon this evidence, the jury convicted the Defendant of DUI. The trial court found him guilty of violating the implied consent law. The trial court sentenced the Defendant to eleven months and twenty nine days for the DUI, to serve 48 hours, and ordered that he lose his driving privileges for one year for violating the implied consent law. It is from those judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court violated his right to confront witnesses; (2) the trial court erred when it declined to instruct the jury about missing witnesses; (3) the trial court erred when it admitted the video recording of his traffic stop; (4) the evidence is insufficient to sustain his convictions; and (5) the trial court erred when it enhanced the Defendant's sentence based upon a reckless prior driving charge.

## A. Confrontation Clause

The Defendant contends that the trial court violated his right to confront a witness against him when it allowed the State's case to proceed without Officer Taylor. He asserts that he was deprived of the ability to cross-examine Officer Taylor on the officer's observations that were the cause of his arrest and prosecution. The State counters that the

trial court properly admitted into evidence a video recording of Officer Taylor's interaction with the Defendant with the instruction to the jury that Officer Taylor's statements were not "evidence" and to disregard them.

Whether the admission of hearsay statements violated a defendant's confrontation rights is a question of law we review de novo. *State v. Marlo Davis*, 466 S.W.3d 49, 68 (Tenn. 2015) (citing *State v. Lewis*, 235 S.W.3d 136, 141-42 (Tenn. 2007)). "'The application of the law to the facts found by the trial court is a question of law' that is subject to de novo review." *Lewis*, 235 S.W.3d at 142 (quoting *State v. Maclin*, 183 S.W.3d 335, 343 (Tenn. 2006)).

In a criminal trial, the defendant has a right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. Our Supreme Court has described the Tennessee Constitution as imposing "a higher right than that found in the federal constitution." *State v. Deuter*, 839 S.W.2d 391, 395 (Tenn. 1992). However, "when deciding claims based on the right to confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014).

In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the United States Supreme Court held that the Confrontation Clause allowed admission of "[t]estimonial statements of witnesses absent from trial . . . only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Two years after *Crawford*, the Supreme Court held that the Confrontation Clause applies only to testimonial hearsay and does not apply to nontestimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823-24 (2006). To distinguish between testimonial and nontestimonial statements, the Court adopted what has become known as "the primary purpose test," concluding:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822.

If a hearsay statement is non-testimonial, the declarant is not a "'witness' within the meaning of the Confrontation Clause," and the statement may be admitted, subject to the other restrictions on hearsay evidence. *Davis,* 547 U.S. at 821; *Lewis,* 235 S.W.3d at 143. When a hearsay statement is testimonial, however, the party seeking to admit the statement must either (1) present the declarant as a witness who will testify and submit to cross-examination, or (2) show that the witness is "unavailable to testify, and [that] the defendant had . . . a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53-55. *State v. McCoy,* 459 S.W.3d 1, 14 (Tenn. 2014) (stating that there are a few exceptions to this rule, neither of which apply in this case).

When determining whether a statement is testimonial, the Court explained that the Confrontation Clause is not violated when testimonial statements are admitted for purposes other than establishing the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n. 9. Since *Crawford,* the Supreme Court has still not "attempt[ed] to produce an exhaustive classification of all conceivable statements - or even all conceivable statements in response to police interrogation - as either testimonial or nontestimonial . . . ." *Davis*, 547 U.S. at 822. However, in *Davis* the Supreme Court instructed that the "primary purpose" of a statement marks the relevant dividing line between the two categories, explaining:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

When determining a statement's primary purpose, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Michigan v. Bryant,* 562 U.S. 344 (2011) (holding that, under the circumstances, the police interrogation of a shooting victim had the primary purpose of responding to the emergency of a roaming gunman and, thus, the elicited statements were not testimonial); *see also Dotson*, 450 S.W.3d at 64.

Our Supreme Court has held that both the federal and state constitutional confrontation provisions are restricted, by their own terms, to "witnesses" and do not encompass physical evidence or objects, such as photographs. *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996) (citations omitted). Indeed, courts of this state have

10

previously held that the confrontation clause provides two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses. *Id.* (citing *State v. Middlebrooks,* 840 S.W.2d 317, 332 (Tenn.1992); *Pennsylvania v. Ritchie,* 480 U.S. 39, 51 (1987)). The Court in *Williams* held that the introduction of the surveillance photographs into evidence did not violate a defendant's federal or state constitutional right to confrontation. *Id.*

The Supreme Court has addressed whether the introduction of reports, through experts, violates a defendant's right to confront a witness against him. *Williams*, 567 U.S. –, 132 S. Ct. 2221 (2012); *Bullcoming v. New Mexico*, – U.S. –, 131 S. Ct. 2705 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527 (2009).

In *Melendez-Diaz,* the Court concluded that "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" were testimonial and subject to exclusion under the Confrontation Clause analysis. 557 U.S. at 307. Based on the facts of the case, the Court concluded that "the affidavits [were] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 311 (citations and internal quotation marks omitted). Moreover, "under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight' of the analyzed substance." *Id.* (quoting Mass. Gen. Laws, ch. 111, § 13) (emphasis in original). "Absent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to be confronted with the analysts at trial." *Id.* (citations and internal quotation marks omitted) (emphasis in original).

In *Bullcoming*, the Court held that the defendant's confrontation rights were violated when the prosecutor introduced results of forensic testing of the defendant's blood alcohol concentration through the testimony of a forensic analyst who was familiar with the laboratory's testing procedure but who did not participate in or observe the test on the defendant's blood sample. 131 S. Ct. at 2709. The Court reiterated the rule that a testimonial statement may not be introduced at trial unless the witness who made the statement is unavailable and the defendant had a prior opportunity to confront the witness. *Id.* The Court rejected the argument that the "comparative reliability of an analyst's testimonial report drawn from machine-produced data" allowed a surrogate witness's testimony to satisfy the constitutional confrontation requirement. *Id.* at 2715. The Court explained, "[The Confrontation Clause] does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." *Id.* at 2716.

11

The Supreme Court addressed the admission of a report in its opinion in *Williams v. Illinois*, 567 U.S. –, 132 S. Ct. 2221 (2012). *Williams* involved a bench trial in a rape case during which a forensic specialist from an Illinois state laboratory testified that she matched a DNA profile from a vaginal swab from the victim, produced by an outside laboratory, to a DNA profile from the state laboratory obtained using a sample of the defendant's blood. A plurality of the Court concluded that the testimony did not violate the Confrontation Clause. *Id.* at 2240. The Court also noted that the outside laboratory's report had not been introduced into evidence, but the Court concluded that there would have been no Confrontation Clause violation even if the report had been entered for its truth. *Id.* at 2242.

The Court explained that statements which violate the Confrontation Clause share two characteristics: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." *Id.* at 2242. Additionally, while the Court noted that the reports in *Melendez-Diaz* and *Bullcoming* qualified as testimonial statements, those cases "did not hold that all forensic reports fall into the same category." *Id.* at 2243. Instead, those reports violated the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial. There was nothing resembling an ongoing emergency, as the suspects in both cases had already been captured, and the tests in question were relatively simple and can generally be performed by a single analyst. *Id*. The Court also noted that the technicians who prepared the reports in *Melendez-Diaz* and *Bullcoming* must have realized that the reports' contents would be incriminating. *Id*.

When applying an objective test to determine the primary purpose of an out-of-court statement, the Court explained, "We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances." *Id*. (citations omitted). In light of that standard, the Court concluded that the primary purpose of the independent laboratory's DNA report "was not to accuse the defendant or to create evidence for use at trial" but instead was to "catch a dangerous rapist who was still at large." *Id*.

The Tennessee Supreme Court, in *State v. Dotson*, noted that there were dissenting opinions in *Williams,* so the opinion provided "little guidance and is of uncertain precedential value because no rationale for the decision - not one of the three proffered tests for determining whether an extrajudicial statement is testimonial - garnered the support of a majority of the Court." *Dotson*, 450 S.W.3d at 68. Ultimately, the *Dotson* Court adopted the District of Columbia Court of Appeals's reading of *Williams*:

It therefore is logically coherent and faithful to the Justices' expressed views to understand *Williams* as establishing - at a minimum - a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the plurality's targeted accusation requirement or Justice Thomas's formality criterion. Otherwise put, if *Williams* does have precedential value . . . an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

*Id.* at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)).

In the case under submission, applying these aforementioned standards, we conclude that the video recording contained testimonial hearsay as defined by *Crawford*. On the video, Officer Taylor is heard saying multiple times on the recording that the Defendant is intoxicated and that he is in no condition to drive or to make decisions. This is a "targeted accusation" that the Defendant has engaged in criminal conduct. The State did not prove that Officer Taylor was unavailable; it in fact never served a subpoena on him. The Defendant was precluded from cross-examining Officer Taylor on issues related to the Defendant's medical condition possibly affecting his performance on the field sobriety tasks and the breathalyzer test. The Defendant stated that he suffered from positional vertigo, for which he had stopped his medication in order to undergo a sleep study, and that he was suffering from the effects of this condition during the field sobriety tasks. The Defendant stated that he had a chronic lung infection, pleurisy, which prevented him from blowing hard into the breathalyzer machine. He was unable to cross-examine Officer Taylor, who conducted both the field sobriety tasks and the breathalyzer examination. The only evidence against him that he violated the implied consent law was the video tape where he can be heard blowing, presumably into a breathalyzer machine. There was no live witness to say what had occurred and, during this portion of the video, neither the officer nor the Defendant can be seen. Accordingly, the admission of Officer Taylor's statements indicating that the Defendant was intoxicated violated the Defendant's Confrontation Clause rights under *Crawford*.

While both the United States Supreme Court and this Court have held that violations of the Confrontation Clause are subject to harmless error review, since the primary evidence proving that the Defendant may have been intoxicated was the video and the statements contained therein, the error was not harmless. Accordingly, the Defendant's convictions for DUI and violating the implied consent law are reversed. While we have so held, so as not to pretermit any issues, we will turn to address the other issues raised by the Defendant.

13

## B. Missing Witness Instruction

The Defendant next contends that the trial court erred when it declined to instruct the jury about missing witnesses, namely Officer Taylor. The Defendant asserts that he asked the trial court to give the jury an instruction on a missing witness but that the trial court declined to do so finding that the Defendant could have issued a subpoena for Officer Taylor. The Defendant offers no citation to the record to support his contention. Issues not supported by citation to the record will be treated as waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). The Defendant is not entitled to relief as to this issue.

## C. Video Recording

The Defendant avers that trial court erred when it allowed the video recording of his traffic stop to be admitted into evidence without Officer Taylor being present to explain the video and provide its proper context. The State counters that the Defendant has waived this issue for failing to cite any legal authority to support his argument. As discussed above, the video recording contained testimonial hearsay, and its admission violated the Defendant's right to confrontation pursuant to the United States and Tennessee Constitutions, as interpreted by *Crawford*. We note that, during the trial, the parties discussed introducing the video with no sound. Whether the admission of the video, with no sound and no "statements" by Officer Taylor, violates *Crawford* is not an issue properly before us for our review, as that was not what occurred during the trial.

The Defendant further contends that the trial court erred when it admitted the video because, without Officer Taylor, the prejudicial effect of the video outweighed any probative value. He asserts that field sobriety tasks are extremely technical in their administration and that, without context, the video was too misleading and confusing to be shown to the jury. The State counters that the trial court properly admitted the evidence because it was probative of the Defendant's intoxication. We conclude that, while the video was relevant, portions of the video contained testimonial hearsay. It also contained admissions and statements by the Defendant that may have been relevant to his level of intoxication. In the event of further review, in our view the statements made by the Defendant on the video are admissions by a party and are therefore admissible.

## D. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions. The State counters that it presented sufficient evidence to support both convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest

15

legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In our consideration of the evidence presented herein, we are guided by the precedent that, regardless of the propriety of the admission of the challenged evidence, the sufficiency of the convicting evidence must be examined in light of all the evidence presented to the jury, including that which may have been improperly admitted. *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008) (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)); *see also State v. Long*, 45 S.W.3d 611, 619 (Tenn. Crim. App. 2000).

In order to sustain a DUI conviction as charged in this case, the State had to prove beyond a reasonable doubt that the defendant drove or was "in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys . . . or any other premises that is generally frequented by the public at large, while . . . [u]nder the influence of any intoxicant[.]" T.C.A. § 55-10-401(1) (2015).

The evidence presented in this case was sufficient to sustain the Defendant's conviction for DUI. Officer Cason testified that the Defendant passed him without his headlights illuminated. The Defendant used his right turn indicator, moved to the left turn lane, and then made a turn going over the double center line. The Defendant could not operate his window properly, and when he opened the car door the odor of alcohol emanated from the car. Once out of the vehicle, the Defendant appeared unsteady on his feet, had difficulty picking up his keys, his speech was slurred, he made incorrect statements about the year he graduated from high school and the year he was born, and seemed generally confused. We conclude that this evidence supports his DUI conviction.

Regarding the evidence against the Defendant pertaining to the implied consent violation, we again note that our standard of review includes reviewing all the evidence presented to the jury, including that which may have been improperly admitted. *See Gilley*, 297 S.W.3d at 763. Therefore, considering the video evidence, Officer Taylor can be heard on the video informing the Defendant of the implied consent law. The sound of blowing is then heard, and presumably the Defendant was blowing into the breathalyzer machine. Officer Taylor then discussed with the Defendant the reading on the machine that he said showed that the Defendant was not blowing properly. The officer allowed

16

the Defendant to attempt to blow several times before informing him that he was going to jail. We conclude that a rational trier of fact could have concluded from this evidence that the Defendant refused to properly take the breathalyzer test, thereby violating the implied consent law. The evidence is, therefore, sufficient to sustain his conviction.

### E. Sentencing

The Defendant next contends that trial court erred when it enhanced his sentence based upon a prior reckless driving charge. The Defendant failed to make any reference to the record and failed to provide a transcript of the sentencing hearing. As such, he has waived this issue. *See* Tenn. R. Crim. App. P. 10(b); Tenn. R. App. P. 24(b).

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we reverse the trial court's judgments. We reverse the Defendant's convictions, vacate the judgments of conviction, and remand the case for further proceedings consistent with this opinion.

_____
ROBERT W. WEDEMEYER, JUDGE